JAMES BLUDWORTH and another *v.* WILLIAM HUNTER and others.

JAMES BLUDWORTH *v.* WILLIAM M. LAMBETH and others.

Where the record shows that all the parties interested are not before the court, and the questions asked to be decided were not acted on in the inferior court, they cannot be examined on appeal.

The mere denial of the existence of any mortgage, is too general an allegation to authorize the admission of evidence of payment, imputation of payment, prescription, or the like. Payment, remission, compensation, and the like, must be specially pleaded.

A prior mortgagee cannot arrest the proceedings of subsequent mortgagees, merely on the ground of the priority of his mortgage. If the property should not sell for enough to satisfy all the mortgages prior to that of the plaintiff in the seizure, there can be no sale; if it should sell for enough, the latter have a right to proceed.

Where the answer of an appellee prays for the amendment or reversal of any part of the judgment appealed from, it must be filed at least three days before that fixed for the argument, or it will not be received. C. P. 890.

The fruits of an immoveable, gathered or produced since it was under seizure, make a part thereof, and enure to the benefit of the person making the seizure (C. C. 457); but crops standing at the time of the sale of the property, are considered part of the land to which they are attached, and pass to the purchaser as part of the consideration of the price. The fruits of mortgaged property are subject to the mortgage only while in the hands of the mortgagor; they cease to be so, when they accrue after its transfer to a *bona fide* purchaser and possessor. C. C. 456.

APPEALS from the District Court of Natchitoches, *King*, J.

*H. A. Bullard*, one of the appellants, *pro se.* No other counsel appeared on the same side.

*Brent* and *O. N. Ogden*, for the defendants.

GARLAND, J. The plaintiffs, Bludworth & Bullard, alleging themselves to be creditors of Hunter, for $11,666 66, with interest, on a promissory note, secured by a conventional mort-

gage and vendor's privilege, in the month of May, 1842, took out an order of seizure and sale, for the purpose of having a plantation and slaves in the possession of Hunter, situated in the parish of Natchitoches, and cultivated as a cotton plantation, seized and sold. A seizure of all the property was made, on which a crop of cotton and corn was growing at the time. Early in the month of June, the whole property was offered for sale by the sheriff, and adjudicated to Lambeth & Thompson, who not complying with the terms.of the sale, it was postponed to be offered for sale again. Before this could be effected, Lambeth & Thompson presented their petition of opposition to the same court, in which they state the origin of the claim and mortgage of the plaintiffs, saying that they (plaintiffs) are assignees of Charles A. Bullard, the original mortgagee, and representing themselves to be also mortgage creditors of Hunter to a large amount, by a special act, in which Charles A. Bullard, before the transfer of the note to the plaintiffs, intervened, and specially ceded his priority of mortgage for the amount of the the note held by the plaintiffs, in favor of these opponents, and that thereby they acquired a preference and higher privilege on the property seized, than the plaintiffs. They say, that the property was exposed for sale, on the 4th June, 1842, when it was adjudicated to said opponents for $18,400, they claiming the right, by virtue of the aforesaid postponement of priority, to stand in the position, and enjoy all the rights and privileges of a first mortgagee, to the extent of the note to which a preference was given, and to be entitled to the proceeds of the sale, after satisfying the *pro rata* share, to be distributed to another note of $11,666 66, with interest, secured by the same mortgage as that under which the plaintiffs were acting, but that the sheriff refused to make them a conveyance, and again advertised the property to be sold, on the 8th August, 1842, in violation of their rights. They, therefore, make opposition to this sale, and pray the court that if it will not restrain the sheriff from making the sale, it will direct him to retain in his hands the proceeds of the sale, after satisfying the *pro rata* amount of the note of $11,666 66, not effected by said postponement, (which the purchaser will have the right to retain), until the further order of

the court, and that the privilege of these opponents on said proceeds, be allowed and established, in preference to any claims on the part of the plaintiffs, until the satisfaction of their mortgage. They pray that the plaintiffs and the sheriff be cited to answer their opposition, and that their privilege be allowed. Upon this petition being filed, the judge directed the sheriff to retain in his hands the proceeds of the sale to be made under the seizure of the plaintiffs against Hunter, to be subject to the further order of the court. The plaintiffs and opponents then agreed, that the proceedings should be suspended and remain as they were, until the court should decide upon the differences between them. This agreement the sheriff says was made on the day of sale, and the seizure and other proceedings under the plaintiffs' order of seizure and sale were all legal and regular. To this opposition H. A. Bullard answered, by disclaiming all interest in the subject in controversy, averring that he has declined accepting the transfer and subrogation from C. A. Bullard, and that the whole claim belonged to Bludworth, his co-plaintiff. The latter answered by denying that the opponents have any mortgage or priority over his mortgage and vendor's privilege. He says that the alleged priority was given by an agent not authorized by C. A. Bullard to give it; wherefore he prays that the priority claimed may be declared null, and that the sheriff disregard the certificate of mortgage so far as it concerns that of the opponents. He says that the opponents failed to comply with the terms of the sale made on the 4th of June, 1842, and that, consequently, it is null and void. He further says, that the opponents have received the sum of $5,000, which belonged to Hunter, for the value of a cotton gin, which was insured and consumed by fire. One half of this sum he prays may be accounted for to him. He also alleges that the growing crop of cotton and corn upon the plantation is subject to his mortgage and seizure, and prays that Hunter, the owner of the plantation, be restrained from removing any part of the same to his prejudice, and that the same be held and decreed to be subject to the seizure already made and still existing. Afterwards, the plaintiffs filed an amended answer to the opposition, in which they say, that since their first answer was filed, Lambeth and

Thompson have caused an execution to be issued on a judgment in favor of the Commercial Bank against Hunter &c., and caused the same property to be seized under it, without regard to the previous seizure of the respondents, and have had the same sold, and that all has been purchased by Charles A. Jacobs, who now pretends to be the owner of the land, slaves, and growing crop. Bludworth says that he has obtained an injunction, prohibiting Jacobs, as well as the opponents and all others, from removing the crop of corn and cotton from the plantation, and asking that it may be decreed to him. They then admit that there was a priority of mortgage conceded to the opponents, "yet deny that any such mortgage now exists; but they allege that, at least, it ought to be credited with a sum of about $18,000, the amount of a judgment in favor of Monges, and another in favor of the Commercial Bank.

They, therefore, pray that the mortgage in favor of Bludworth may be decreed to exist upon the property in the hands of Jacobs, or the opponents, particularly on the crop of cotton, which, it is asked, may be decreed to him. To this amended answer no response was made by Lambeth & Thompson, nor by Jacobs, on whom it does not appear ever to have been served.

On the 8th November, 1842, Bludworth presented another petition, in which he recapitulates his being the holder of the note of Hunter, and its being secured by mortgage, and refers to the proceedings before stated, and to the fact of the suspension of the seizure, until the matters in controversy shall be decided. He re-asserts his claim on the crop of cotton and corn, and claims an undivided half 'of the whole of it; says that part has been gathered since the sale, and a part remains ungathered in the field, still subject to his seizure. He refers to the seizure by the Commercial Bank, at the instance of Lambeth & Thompson, pending their opposition, and while the property was under seizure at his suit, and to the sale to Charles A. Jacobs. He says that he is apprehensive that the crop will be removed and disposed of to his prejudice, either by Lambeth & Thompson, Jacobs, or Hunter, unless restrained and enjoined, inasmuch as it is said that the crop was sold with the plantation, and is the property of Jacobs, which he denies, but avers that it is subject

to his prior seizure, as mortgagee. He says that the crop of cotton will amount to 400 bales, worth $12,000. He, therefore, prays for an injunction, restraining Jacobs, Lambeth & Thompson, Hunter, and the sheriff, from removing the crop of cotton from the plantation, and the jurisdiction of the court. He asks for a citation of all the parties, and that the cotton be sold for his benefit. This is the beginning of the suit to which Jacobs is made a party, which, it is to be observed, was filed before the last amended answer of Bludworth. To this petition the sheriff answered, as he did to the opposition of Lambeth & Thompson, that he acted officially, and was willing to do whatever the court should order. Jacobs and Lambeth & Thompson moved to dissolve the injunction, on the allegations in the petition. They asked for damages; and in the event of their motion failing, they pleaded a general denial.

The note upon which the plaintiff proceeded, arose out of a purchase made by Hunter of C. A Bullard, of one half of the plantation and slaves mortgaged to secure it. There is another note, in the hands of some unknown person, for the same amount, secured by the same mortgage. The fact of C. A. Bullard having ceded to Lambeth & Thompson, a priority in favor of their mortgage against Hunter, before he transferred the note to the plaintiffs, is not now denied. This was done in July, 1840, and the act was recorded on the 8th of September of that year. On the 7th of May, 1840, the Commercial Bank had its judgment against Hunter and C. A. Bullard recorded; and pending the suspension of the questions between the plaintiffs and Lambeth & Thompson, the latter, who had been subrogated to the rights of the Bank, issued an execution thereon, and had the whole property mortgaged, including the crop of cotton and corn, sold on the 5th of November, 1842, for upwards of $60,000, when it was adjudicated to Lambeth, as the agent of Charles A. Jacobs. The certificate of mortgage showed a large amount of mortgages and judgments, in favor of different persons, who are not before us. The amounts coming to them, were retained by the purchaser, although one or more of them is a judicial mortgagee; and the judgment is not shown to have belonged to the purchaser, or to the opponents. The sheriff conveyed to Jacobs all the

crop of cotton and corn, disregarding the plaintiffs' seizure, as well as the lands and slaves, stock, &c.; and gave Jacobs possession without retaining any thing in his hands to abide the decision of the court, as between the plaintiffs and the opponents. It is admitted that Lambeth & Thompson received the sum of $5000 for insurance on the cotton gin, as alleged in the separate answer of Bludworth. It was proved that from 230 to 270 bales of cotton were sent to Lambeth & Thompson, by Hunter, in the spring of 1842, worth from $27 to $30 per bale, nett, in New Orleans. It is also proved that Hunter always shipped his crops of cotton to Lambeth & Thompson. In 1842, Hunter had from 700 to 800 acres in cotton, and about 900 acres in cultivation altogether. About 4000 barrels of corn were made in 1842, worth 62 cents per barrel. The witness thinks 600 bales of cotton were made in 1842. It is admitted that, at the time of the seizure by the Commercial Bank, 800 barrels of corn, and 125,000 pounds of seed cotton, were gathered; and it is proved about 300,000 pounds of seed cotton were picked, when the that sale was made to Jacobs. It is shown that Lambeth & Thompson furnished Hunter with his plantation supplies, and it is not known whether any imputation of the proceeds of the crops had been made, or any directions given in relation to them.

The causes were tried together in the District Court, though it seems that they were not regularly consolidated. The judge decreed that Bludworth should recover of the defendants in injunction, one undivided half of three hundred thousand pounds of seed cotton, being the quantity gathered at the time of the sale to Jacobs, on the 1st Monday of November, 1842. He ordered the injunction to be perpetuated until the cotton should be sold, and one half of the proceeds applied towards the demand of the plaintiffs. He, also, ordered the opposition of Lambeth & Thompson to the order of seizure and sale in favor of the plaintiffs, to be dismissed as in case of non-suit. From this latter judgment the plaintiffs have appealed, saying that the judgment ought to be final, and that, as pending the proceedings in the District Court, Jacobs had become the purchaser of the property, he ought to be made a party, and he has accordingly been cited. Bludworth, also, appealed from the judgment

rendered on the injunction, alleging that injustice had been done him, in not allowing him a privilege on the undivided half of the whole crop of cotton made on the plantation in the year 1842, instead of the undivided half at the time of the sale to Jacobs, on the first Monday of November, 1842.

To the first appeal, neither Lambeth & Thompson, nor Jacobs have filed any answer. They have not joined in the appeal, nor complained of the judgment, by filing any points, nor asked the reversal of the judgment. Article 887 of the Code of Practice, says, that the appellee, in his answer, may either pray for a simple confirmation of the judgment, with costs, or he may pray for damages, &c. The succeeding article says, that if the appellee has cause to complain of the judgment appealed from, he may, without appeal on his part, state, in his answer, the points on which he thinks he has sustained wrong, and may pray that the judgment be reversed with respect to them, and confirmed, with costs, as to the rest. The next article says, that if the appellee, on the appeal of the other party, neglect to pray that the judgment be reversed on those points which are prejudicial to him, he shall not afterwards be allowed to appeal, but that the judgment shall remain irrevocable for, or against him.

The appellants have had the cause set down for trial, and we are, therefore, only to look into the judgment for the purpose of seeing whether any injustice has been done to them in dismissing the opposition, as in case of non-suit. Upon an examination of the case as it now stands, we do not see that any serious injury can result to the plaintiffs from that decision. Pending the proceedings in the District Court, Lambeth & Thompson had an execution issued, and the property sold under it, at the suit of the Commercial Bank; and a third person, (Jacobs,) not a party in the court below, is now the possessor of it, and, we suppose, before the plaintiffs can proceed further on their order of seizure and sale, he must be made a party. In fact, we do not understand the plaintiffs as wishing to set aside the sale to Jacobs, but to come in with others, and share in the part of the price he has retained in his hands. They insist that several of the mortgages mentioned in the certificate of the recorder, have been extinguished by prescription, by payment, or in some other

manuer; and we have been called on to adjudge these questions, and to declare that there is a sufficient sum in the hands of Jacobs to pay all that is really due on the apparent mortgages, and also to pay the plaintiffs. From the record, we have reason to believe, that all the parties interested in these mortgages and judgments, are not before us; these questions were not acted on in the inferior court; and we cannot inquire into them here.

The plaintiffs offered evidence in the court below, to prove that the mortgage in favor of Lambeth & Thompson against Hunter, was extinguished, in part, by the sum of $5,000, received for the insurance on the cotton gin, and by the proceeds of the crop of cotton sent to them by Hunter, in the spring of 1842. To this the counsel for Lambeth & Thompson objected, on the ground that there was no allegation in any of the pleadings of the plaintiffs of any extinguishment of the mortgage by payment or otherwise, except by applying a judgment in favor of one Monges to it. The only allegation under which it is pretended that the evidence is admissible, is that, in which the plaintiffs deny the *existence* of the mortgage, and then say, if it does exist, that the judgment of Monges should be deducted from it. There is no plea of payment, prescription, compensation, or remission, but simply a denial of the existence of the mortgage. The counsel contends that such evidence took them by surprise. The judge admitted the evidence, and the counsel of Lambeth & Thompson took a bill of exceptions. We think the judge erred. The mere denial of the existence of the mortgage, we think too general an allegation, to admit of evidence of payment, imputation of payment, prescription, or the like, by which it may have been discharged. We have often said, that pleas of payment, compensation, remission, and the like, must be specially alleged. The only part of the pleadings in which any thing is said about the money received for the insurance on the cotton gin, is in one of the answers of Bludworth, in which he claims that one half of the amount shall be applied to his mortgage. But there is another ground upon which, we think, the judgment is correct. Lambeth & Thompson, although they may have a prior mortgage to that under which

the plaintiffs claim, have no right to arrest them in their pro-
ceedings, because, if the property should not sell for enough to
cover all the mortgages prior to that of the plaintiffs, there could
be no sale; if it should sell for enough to pay all, the plaintiffs
have a right to go and make their money. An elder mortgagee
has no right to stop the proceedings of a younger one, merely
because he has a priority. 7 Mart. N. S. 281.

We think the justice of the case will be best promoted by
leaving the judgment of the District Court as it is. It will ena-
ble the plaintiffs, whose order of seizure and sale will be free of
any opposition, to make any parties that may be necessary to
carry it into execution, or for the purpose of having justice ren-
dered to all concerned, in the distribution of the price of the
property in the hands of Jacobs; or enable them to proceed
against him to annul the sale, if cause exists; or to pursue any
other course the law may authorise.

As to the judgment rendered on the injunction : The day before
the cause was argued in this court, the counsel for the defen-
dants filed an answer, praying an amendment of the judgment,
so as not to give any portion of the cotton seized to the plaintiff
in the injunction. This, the appellant objected to, because it
was not filed three days before the day on which the cause was
fixed for trial. This objection is sustained by the Code of Prac-
tice, art. 890, which requires such an answer to be filed three
days before the day of argument. In the early part of the term
in the Western District, answers of this description have been
sometimes put in, only a day or two before the argument; but
it is allowed only to facilitate business in the early part of the
term, and considered as a matter of consent. When this case
was argued, the court had been in session more than two weeks,
and the appellees had had ample time to comply with the law.

Upon the merits, the judgment must be affirmed, unless we find
that some error has been committed to the prejudice of the ap-
pellant. It seems to us there is none. He claims one half of
all the ungathered crop after the sale to Jacobs. The standing
crops at the time of the sale to Jacobs, were attached to the
land, and are considered a part thereof, (Civil Code, art. 456,)
and were included in the price given for it. If the plaintiff in

any further proceeding, should claim a share of that price, in the hands of the purchaser, and succeed, he will then get his share of the value of the ungathered crop. In the 5 Mart. N. S. 52, this court said, the fruits of mortgaged property are subject to the mortgage only whilst in the hands of the mortgagor; they cease to be so when they accrue after the transfer of the original property to a *bona fide* purchaser and possessor. There is nothing now before us, to justify us in saying that Jacobs is not a real and legal purchaser.

Article 457 of the Code says, that the fruits of an immovable gathered or produced since it was under seizure, are considered as making a part thereof, and enure to the benefit of the person making the seizure. It is clear, therefore, that the seizure only operates on the gathered or severed fruits, and that when the property is sold the standing crops and fruits go with it.

*Judgment affirmed.*